J-S05007-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                :          PENNSYLVANIA
                                :
           v.                   :
                                :
                                :
ZACHARY JOHN SAFLIN         :
                                :
          Appellant        :     No. 641 WDA 2023

Appeal from the Judgment of Sentence Entered January 13, 2023
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s):  CP-65-CR-0002190-2020

BEFORE:  PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:        **FILED: April 25, 2024**

Zachary John Saflin appeals from the judgment of sentence entered by the Westmoreland County Court of Common Pleas on January 13, 2023. Saflin challenges the weight of the evidence supporting his convictions. We affirm.

Saflin was charged with Count 1 - criminal attempt – rape by forcible compulsion, Count 2 - aggravated indecent assault without consent, Count 3 - aggravated indecent assault by forcible compulsion, Count 4 - false imprisonment, Count 5 - indecent assault by forcible compulsion, and Count 6 - furnishing alcohol to minors.

Since, when considering an appeal based upon the weight of the evidence, we must review whether the trial court abused its discretion in rejecting the contention, we first look at the factual history as summarized by the trial court:

On May 18, 2020, victim, K.C., threw a birthday party for her friend, A.H., located at K.C.'s grandparents' house in Ligonier, PA.

K.C. threw the party with the permission of her grandfather. Approximately 12 people attended the party, including, D.M., G.P., G.J., M.B., D.H., R.C., A.G., A.H., K.C., and [Saflin]. K.C. never met [Saflin], but was familiar with others attending the party.

Some individuals brought tents to stay overnight after the party. There were a total of four tents set up. K.C.'s tent slept one person. A.H.'s tent was big enough for two people.

Before the party, A.H., M.B., D.H., and [Saflin] traveled to Sheetz in Ligonier to purchase alcohol. A.H. and M.B. gave [Saflin] cash to purchase alcohol for them, including Redd's Wicked and Twisted Tea pounders. D.M. also supplied alcohol for the party.

The party started around 11:30 P.M. or 12:00 A.M. K.C. estimated that she drank about four Yuengling beers provided by D.M. After that, [Saflin] gave K.C. beers, but K.C. was "dumping them out as [Saflin] was giving them to [her]" either on the ground next to her or in the woods when she had to use the restroom. K.C. explained, "I didn't like the surroundings near the dark, not knowing and not picking who was there. My anxiety was heightened. I figured I reached my limit. I reached a buzz. I was giggly. I thought that was the point to stop."

K.C. described [Saflin] as a "shadow" that evening in that "everywhere we were, he was kind of, like, right there behind us or next to us." This made K.C. uncomfortable because A.H. invited [Saflin] because he and A.H. were "supposed to become a thing." "I felt he was more so like interested in me that night, and I didn't like it." K.C. was not interested in [Saflin]. K.C. tried to keep her distance from [Saflin] by walking away from him or talking to other people throughout the evening. When [Saflin] spoke to her, K.C. would "keep it short."

A.H. confirmed that she and K.C. were drinking. A.H. testified that she was not completely intoxicated, but had a few drinks. A.H. described K.C. as "just kind of falling around" and "being goofy." However, A.H. stated that K.C.'s behavior was "mainly in front of everyone that was there." A.H. observed that [Saflin] "liked [K.C.]

throughout the night," but K.C. did "not really give off any signs that she was interested in him."

K.C. testified that, later in the evening, A.H. suggested that they should have a threesome with [Saflin]. K.C. said "no" and that it would not be a good idea because it would ruin their friendship and make it awkward between them. A.H. testified that K.C. initially agreed to the threesome, but then said "no" later that night. A.H. stated, "[t]owards the end of the night, she was alert and oriented whenever she knew that she didn't want to proceed with the threesome."

After the conversation with A.H., K.C. proceeded to blow out tiki torches around the party. To avoid talking to A.H. further about the proposed threesome, K.C. testified that she "used her time wisely" by blowing the torches out "very slowly." K.C. purposely missed the tiki torches so it would take her longer to blow them out. At that point, K.C. estimated it was approximately 45 minutes since she had consumed her last drink. K.C. testified that she was "stumbling around as to faking being highly intoxicated because I was given more than just four beers. Everyone thought I drank them." K.C. testified that she only consumed four drinks.

A.H. and K.C. got into A.H.'s tent, and [Saflin] eventually followed. [Saflin] shut the tent. A.H. and K.C. were lying beside each other. [Saflin] began to kiss A.H. While removing A.H.'s pants, [Saflin] went over to K.C. However, K.C. said "no." K.C. stated that she turned on to her stomach and had her right arm underneath her holding A.H.'s hand really tight. K.C. kept saying that she didn't want to do this, loud enough for both A.H. and [Saflin] to hear. Then, things "escalated." K.C. felt a lot of body pressure on her legs and on her back as [Saflin] was laying on both K.C. and A.H. K.C. could not see what was happening between [Saflin] and A.H., but heard kissing noises. K.C. tried unzipping the tent multiple times, but she felt her arm getting dragged back in. K.C. told [Saflin] and A.H. that she had to use the bathroom and that she had to throw up to get out of the tent. K.C. was crying and started gagging herself to try to get out. When K.C. finally unzipped the tent, she got out and walked toward the fire pit.

A.H.'s testimony was consistent with K.C.'s. A.H. stated that K.C. said "no" more than once and grabbed A.H.'s wrist when they were inside the tent. A.H. stated that "it was pretty clear [K.C.] did not want anything to do with sexual intercourse." A.H. could not see

what occurred between [Saflin] and K.C., but said that K.C. began to cry and dry heave, which A.H. knew to be a response from K.C. when she was upset. A.H. confirmed that K.C. said that she didn't want to do this and didn't want [Saflin] to touch her.

K.C. testified that, about two paces from the fireplace, [Saflin] picked her up. K.C. screamed "no" and squirmed when [Saflin] picked her up. After [Saflin] picked her up, he carried K.C. back up the hill and into her single tent. [Saflin] placed K.C. on her back. K.C. grabbed the front of her sweatpants and held them up. [Saflin] started kissing K.C. He kissed her ear then belly button. [Saflin] had all of his body weight on K.C. [Saflin] had his hand on K.C.'s buttocks, underneath her sweatpants, then moved his hand to the front and penetrated her vagina with his hand. K.C. estimated that she said "no" more than 30 times. "I was [ ... ] hysterically screaming, crying, 'no, no, no.'" "I couldn't get anything else out of my mouth other than the word 'no.'" "Then I started saying that I had to pee again, I had to go to the bathroom. And then he got up off of me. And as soon as he did, I got right out of the tent, and I walked up the hill to the left of the tent away from the tent and I [saw] A.H."

When A.H. saw K.C., A.H. described her as "an emotional wreck." K.C. was crying and dry heaving. K.C. told A.H. that she didn't want [Saflin] to touch her and that [Saflin] needed to leave.

A.H. went back to her tent and found [Saflin] laying in the tent without pants on, and told him that he had to leave because whatever he did scared K.C. [Saflin] responded that he didn't do anything. [Saflin] left the premises.

A.G. and R.C., who were dating at the time of the party, also provided testimony about the incident. A.G. had a few sips of alcohol throughout the party. R.C. could not drink due to epilepsy. A.G. testified that A.H., K.C., and [Saflin] appeared "intoxicated" the night of the incident. R.C. testified that K.C. was stumbling a little but could keep her own balance. A.G. and R.C. saw [Saflin] carry K.C. into one of the tents, but thought he was just helping her because she was intoxicated. However, when K.C. and [Saflin] were inside the tent, A.G. and R.C. heard K.C. saying "no" and "get off of me" up to five times. A.G. and R.C. came out of their tent once they heard K.C. say that she was going to get her grandparents.

K.C. went into her grandparents' house to tell them about the incident. K.C. was "hysterical" and "bawling." "I kept repeating I didn't want him to touch me. I kept apologizing to A.H. because I [ ... ] ruined her party. So, I was still crying. I was hysterical." K.C.'s grandfather testified that "she was extremely distraught." K.C.'s grandparents called the police and K.C.'s parents. When the police arrived, they asked K.C. to go outside to provide a report about what happened.

Shortly after K.C. provided her statement, she went with her parents to the hospital. K.C. did not undergo testing by a rape kit given the nature of the incident. K.C. testified that she never gave consent for [Saflin] to touch her sexually, nor did she want [Saflin] to touch her in that manner.

On cross-examination, K.C. clarified an inconsistency in the police report. K.C. testified that she did not tell police that [Saflin] carried her into A.H.'s tent and touched her vagina in A.H.'s tent. Rather, [Saflin] carried her to her own tent and that this occurred in her own tent.

The incident was investigated by Pennsylvania State Police Troopers Robert Politowksi and David Wineland after reviewing a report from the Ligonier Police Department. Trooper Politowski and Trooper Wineland each provided testimony regarding the investigation. Regarding their interview with K.C., Trooper Politowski testified that K.C. told him that there was an incident where [Saflin] had fondled [K.C.] and penetrated her vagina with his finger. K.C. reported to Trooper Politowski that she told [Saflin] "no" multiple times. When K.C. was finally able to get away from [Saflin], K.C. told her grandparents, who called the police.

Troopers Politowski and Wineland interviewed [Saflin] outside of his residence. Politowski testified that [Saflin] explained the night was "uneventful," that he was present, and that he was drinking. [Saflin] stated he purchased alcohol, but that he did not provide the alcohol to others. [Saflin] reported that K.C. went to the hospital for a rape kit. When the troopers asked him to elaborate, [Saflin] stated that he, A.H., and K.C. were in a tent when K.C. began crying. [Saflin] stated that K.C. came on to him, was very intoxicated, and that she was falling over at one point at the party. [Saflin] attempted to kiss K.C. in A.H.'s tent and when K.C. left that tent upset, he followed her to her tent. [Saflin] admitted that

he kissed K.C. When the troopers informed [Saflin] that K.C. told them something more happened than [Saflin] was describing, Politowski testified that [Saflin] admitted to grabbing K.C.'s breasts on the outside of her bra and grabbing her buttocks on the outside of her pants. Politowski asked [Saflin] why K.C. would get a rape kit if they were touched on the outside of their clothes, to which [Saflin] admitted to touching her bare vagina, rubbing her clitoris, and penetrating her vagina with his finger. Politowksi testified that [Saflin] said K.C. said "no" approximately two to three times. Politowski asked [Saflin] whether [Saflin] decided that he was going to attempt to have sex with K.C. even though she told him "no" multiple times, [Saflin] said "yes." Additionally, [Saflin] said that he continued to try to attempt to have sex with K.C. for approximately two minutes after she said "no." Politowski took notes in the beginning of the interview, then when questioning [Saflin], he stopped writing to make sure he was fully paying attention. However, Politowski made sure his notes were accurate and repeated the information back to [Saflin]. [Saflin] acknowledged what he told the officers was true.

On cross-examination, Defense Counsel questioned Trooper Politowski regarding inconsistencies in the police report and live testimony. When asked if he had a clear recollection of [the] interview with [Saflin], Politowski said, "I have a recollection of the interview, the admissions, and the confession. But the question I was answering regarding what I specifically told [Saflin] he was being accused of, I don't remember verbatim what I told him." "I obviously told him that it was of a sexual nature, and then [the] interview continued." Even with inconsistencies presented, Politowski described the witness' testimony and his report as "largely consistent," including K.C. repeatedly saying "no," crying, gagging, and that [Saflin] penetrated K.C.'s vagina with his finger.

Trooper Wineland testified that he recalled Politowski asking [Saflin] if he intended to have sex with K.C. when he went into her tent, and that [Saflin] responded that he did. At that point in the interview, [Saflin] already said that K.C. said "no" and that it was against her will, so Wineland asked how long [Saflin] continued to sexually assault K.C. after she said "no," to which [Saflin] said "two minutes." On cross examination, Defense Counsel stated this was inconsistent with their report, which stated that [Saflin] said that he continued to attempt to have sex with the victim for approximately two minutes after the victim said "no." Even without this part of the testimony, Wineland stated that

[Saflin] made admissions that K.C. had said "no" two or three times.

Neither trooper preserved their notes from the interviews. They did not have [Saflin] or other witnesses give written or recorded statements. Politowski stated that he and Wineland completed their report within a week after the interviews. Troopers did not attempt to contact Sheetz for further investigation tying [Saflin] to the purchase of alcohol.

Trial Court Opinion, 6/23/23, at 3-9 (citations omitted).

On October 20, 2022, following a three-day trial, a jury acquitted Saflin of Count 1 and found Saflin guilty of Counts 2 through 6. The trial court sentenced Saflin to an aggregate term of twenty-two to forty-four months' incarceration followed by five years' probation.

Saflin filed a timely post-sentence motion, in which he challenged the weight of the evidence supporting his convictions. At the direction of the trial court, Saflin filed a brief in support of his motion, in which he argued K.C.'s testimony "was discordant, inconsistent, and at times contradictory." Brief in Support of Post-Sentence Motions, 2/21/23, at 10. Further, Saflin challenged the quality of the investigation conducted by the Pennsylvania State Police. *See id*. at 12-14.

On appeal, Saflin argues the jury's verdict was against the weight of the evidence. A challenge to the weight of the evidence "concedes that the evidence is sufficient to sustain the verdict but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *Commonwealth v. Orie*, 88

A.3d 983, 1015 (Pa. Super. 2014) (citation omitted). A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004) (citations omitted).

> When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa. Super. 2009) (internal quotes and citations omitted).

Saflin argues his convictions are against the weight of the evidence due to the inconsistent, contradictory, and unreliable testimony given by the Commonwealth's witnesses. Specifically, Saflin challenges the testimony of the victim and the investigating officers.

Saflin essentially asks us to reassess the credibility of K.C. and the investigating officers and to reweigh the evidence presented at trial. However, even "in instances where there is conflicting testimony, it is for the jury to

determine the weight to be given the testimony. The credibility of a witness is a question for the fact-finder." **Commonwealth v. Hall**, 830 A.2d 537, 542 (Pa. 2003) (citation omitted). Upon review, we conclude the evidence more than adequately supports the trial court's determination that the verdict was not so contrary to the evidence as to shock its conscience.

The jury, sitting as the finder of fact, chose to believe the evidence presented by the Commonwealth and the logical inferences derived therefrom, as was its right. The jury obviously gave serious consideration to the trial evidence and the arguments of counsel, as evidenced by its decision to find Saflin not guilty of the first count but guilty on the remaining charges. In addressing Saflin's challenge to the weight of the evidence the trial court concluded the jury's findings were not so contrary to the evidence as to shock one's sense of justice. **See** Trial Court Opinion, 6/23/23, at 17.

It was within the province of the jury as factfinder to resolve all issues of credibility, resolve any conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately find Saflin guilty. The jury weighed the evidence, credited K.C.'s testimony, and concluded Saflin committed the crimes charged in Counts 2 through 6. Following our careful and close review of the trial evidence, we find that the trial court did not err in concluding the jury's verdict was not so contrary to the evidence so as to shock one's sense of justice. While the court agreed that there were inconsistencies in the testimony at trial, it properly concluded that

the issue was one of credibility for the jury to resolve, and ultimately none of the inconsistencies rose to the level of being shocking to one's sense of justice. *See* Trial Court Opinion, 6/23/23, at 14. Accordingly, we conclude the trial court did not abuse its discretion in determining Saflin's weight claim lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/25/2024